UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA

                                           MEMORANDUM AND ORDER

       -against-
                                              02 CR 888 (RJD)

PHILLIP ANTHONY MOE,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEARIE, Chief Judge.

        This case is on remand from the United States Court of Appeals for the Second Circuit,

which vacated this Court's denial of defendant's motion to dismiss his indictment for illegal

reentry after deportation to Guyana following his conviction for an aggravated felony, in

violation of 8 U.S.C. §1326(a).  See United States v. Moe, 214 Fed.Appx. 66 (2d Cir. 2007)

(summary order) ("Moe II"), *vacating* United States v. Moe, 02 Cr 888 (E.D.N.Y. Oct. 17, 2005)

("Moe I").  Defendant's motion was a due process challenge to the underlying deportation order,

as authorized by section 1326(d).

        In denying the motion, this Court considered each of the favorable and adverse factors

catalogued in United States v. Copeland, 376 F.3d 61 (2d Cir. 2004), before concluding that

defendant could not show the required statutory prejudice because his substantial criminal history

outweighed any favorable evidence that he could have presented in an application for section

212(c) relief.  Moe I at 5-6.  In its summary order, however, the Second Circuit stated that the

record should have been further developed on the issue of prejudice, and remanded "[b]ecause

the District Court did not engage in the factfinding process called for by Copeland before finding that [defendant] could not demonstrate prejudice." Moe II, 214 Fed.Appx. at 69.

Having conducted the required evidentiary hearing, the Court must again deny defendant's motion to dismiss. Although the testimonials from relatives revealed, predictably, that loyal families are invariably affected by the legal consequences of a member's crimes, the hearing as a whole—including important testimony from defendant himself—served only to reinforce this Court's original view of how defendant would have fared in an actual 212(c) proceeding.

## DISCUSSION

A. Applicable Standards

Familiarity with the two prior decisions in this case is assumed. The Second Circuit having concluded that defendant's fundamental rights were violated when he was erroneously informed, before deportation, that he was not entitled to seek 212(c) relief, the sole question on remand is whether defendant was prejudiced by this error. In a Copeland hearing, the court to "first obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." 376 F.3d at 74. Playing "the role of prognosticator," Edwards v. INS, 393 F.3d 299, 311 (2d Cir. 2004), the court's charge is to "reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences." United States v. Scott, 394 F.3d 111, 119 (2d Cir. 2005).

Section 212(c) analysis, as outlined in Moe I, appropriately involves a "balancing" of the "adverse factors evidencing an alien's undesirability as a permanent resident" with "social and

2

humane considerations presented in his behalf," the ultimate question being "whether the granting of section 212(c) relief appears in the best interests of this country." In re Marin, 16 I. & N. Dec. 581, 584 (BIA 1978) (quoted in Copeland, 376 F.3d at 74); see Moe I at 5 (reviewing adverse and favorable factors as catalogued in Copeland). The familiar requirement that narcotics convictions on the adverse side of the ledger can be offset only by a showing of outstanding or unusual equities on the favorable side, see Moe I at 5, not disputed here, "is not exclusively triggered" by narcotics convictions, but may also be mandated "because of a succession of criminal acts, which together establish a pattern of serious criminal misconduct." Matter of Buscemi, 19 I. & N. Dec. 628, 633 (BIA 1988).

In less than a decade, from 1985 through his final pre-deportation incarceration in 1994, defendant managed to accumulate criminal convictions on eight separate occasions, including three for aggravated felonies—possession of a loaded firearm, possession of crack cocaine and sale of crack cocaine. See Philip Moe Criminal History Report, Hearing Exhibit PM-B. His earliest round of marijuana arrests, at the age of 22, came just three years after his arrival here, and followed each other in close sequence (the second came three weeks after the first, and a third arrest a month after that). Id. Defendant's other crimes include bribery of a public official and criminal impersonation, and he routinely resorted to subterfuge, including the use of at least eight different aliases, five false social security numbers, six different dates of birth, and five different places of birth. Id. Defendant's misconduct also led to the revocation of his probation, and the issuance of at least four different bench warrants for his arrest for failure to comply with conditions of his probation. Id.

Because outstanding equities are required to overcome either a single narcotics conviction

3

standing alone or a pattern of otherwise serious crimes not involving narcotics, an alien such as defendant, carrying not one but two narcotics convictions that are themselves indicative of a sustained course of criminal conduct, bears a heavy burden indeed. Furthermore, the Board of Immigration Appeals (BIA), in several decisions brought to this Court's attention by defendant's expert,[1] has denied 212(c) relief even when "unusual or outstanding equities" were established. E.g., Matter of Buscemi, 19 I. & N. Dec. at 634; Matter of Coehlo, 20 I. & N. Dec. 464, 469 (BIA 1992). Matter of Edwards, 20 I. & N. Dec. 191, 198 (BIA 1990). This is because an alien's proof of unusual equities "merely satisfies the threshold test for having a favorable exercise of discretion considered in his case; such a showing does not compel that discretion be exercised in his favor." Buscemi, 19 I. & N. Dec.at 634. Accord Coehlo, 20 I. & N. Dec. at 469; Edwards, 20 I. & N. Dec.at 198.

B. Government's Threshold Objection

The Government argues that the Court should not even undertake to reconstruct a section 212(c) hearing because defendant's weapons conviction required him to first seek an adjustment under section 245 (8 U.S.C. §1255) in order to become eligible to seek 212(c) relief, and the conditions necessary for 245 relief were not satisfied. Gov. Ltr. in Opp. at 4-7.

The Court is not persuaded that defendant's failure to pursue or secure section 245 relief

---

[1] Many BIA decisions are unpublished and inaccessible, and the BIA only wrote decisions in about half the cases decided at the time defendant would have sought 212(c) relief. Scott, 394 F.3d at 116. Accordingly, the Court heard testimony from Gerald Seitt (called by defendant), an experienced immigration practitioner who advised the Court on section 212(c) cases, a growing Copeland practice in this district. See, e.g., Copeland II (Weinstein, J.); United States v. Russo, 2005 WL 1243311 (E.D.N.Y.) (Ross, J.)

before his deportation affects the present application. The Circuit has already found that the BIA violated defendant's rights by informing him that he was ineligible for 212(c) relief, <u>Moe II</u> at 3, and under <u>Copeland</u>, IJ's, like ALJ's in social security cases, have "special duties" to advise: "[g]iven. . . that many aliens are uncounseled, our removal system relies on IJs to explain the law accurately to pro se aliens." 376 F.3d at 71. "Otherwise," <u>Copeland</u> explains, "such aliens would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal." <u>Id.</u> Any "prejudicial misinformation about 212(c) relief" is fundamental error. <u>Id.</u>

Assuming without deciding that a section 245 adjustment should have preceded any section 212(c) waiver, the record does not establish that defendant knew of this procedural requirement or that the IJ or BIA appropriately advised him of it. A failure to explain this aspect of immigration law to defendant would be "prejudicial misinformation about 212(c) relief" under <u>Copeland</u> and thus not a bar to the present motion.


## C. Evaluation of Hearing Testimony

### 1. Family Ties and Impact on Family of Defendant's Deportation

As to whether family ties *exist*, there can be little question: they are apparent, extensive, and as is often the case, resilient, having survived the separation occasioned by incarceration and deportation. No fewer than seven members of defendant's immediate and extended family appeared in person to testify: defendant's daughter Erica (age 17); his mother Elroy Delores (age 62); his younger brothers Ken (age 40), Michael (age 36), and Leon (age 42); his wife Annemarie (age 40), who is the mother of only one of defendant's five children, Latoya (age 20); Georgia

Tomlinson, the mother of Erica and two more of defendant's children, daughter Raven (age 15) and son Akeem (age 13);[2] and Tomlinson's sister Sophia Malcolm, who describes herself as "good friends" with defendant, whom she chose as godfather for her son. Tr. 110-12. Defendant's oldest child, daughter Shelly, did not appear but wrote a letter, as did Latoya and defendant's sister, Diann.

Each of defendant's siblings and his mother emigrated with him from Guyana or followed a year later; possesses or is in the process of acquiring American citizenship; and presents, collectively, an impressive record of law-abiding, gainfully employed lives in their adopted country. Tr. 46, 47, 57, 58, 67, 68, 73-5, 92, 93, 110-12. The children about whom the Court heard testimony are, despite some difficulties to be discussed, likewise leading productive lives: Erica, at the time of the hearing, held a summer job while taking a summer class and was to enter her senior year at the High School for Legal Studies, while Latoya was attending school and involved in dance and cheerleading and Shelly was about to be married in Europe. T. 411-2; Exhibit PM-E.

Not one of these witnesses failed to express familial affection for defendant, to attest to defendant's occasional discharge of brotherly or fatherly duties, such as giving advice or escorting a daughter to the park, Tr. 44, 49, 58-59, 63, 69, 70, 75, 94, 103, or, therefore, to evoke the Court's sympathy. The fact that so many appeared in person to testify speaks to this Court as much as the content of their testimony, delivered with heartfelt belief in defendant.

It is not surprising, therefore, that discernible emotional fallout might follow the deporting

---

[2] Ms. Tomlinson has another daughter, Tasha, not fathered by defendant. Tr. 101.

of a member of this family.[3] The Court is not unmoved by the collective wishes of all who testified to their sincere desire to have their stray family member back among them,[4] and by the particularly emotional response of two of defendant's daughters. Seventeen year-old Erica testified poignantly that she misses her father and described tearfully her wish that her father could attend her upcoming high school graduation, while her uncle confirmed that she cries at the mere mention of defendant. Tr. 44, 62. Twenty-year old Latoya, according to her mother, has become disobedient, rebellious and difficult for her mother to handle since the deporting of defendant, who had once had some influence on the girl. Tr. 75, 76, 78.

Nonetheless, the Court does not find that these family considerations, in this case, are sufficient to outweigh defendant's substantial criminal conduct. Given the understandable

---

[3] The Government argues that the hardship, if any, that deportation has had on defendant's family, inasmuch as it concerns the period following defendant's immigration hearing in 1995, is irrelevant as a "future occurrence" barred by United States v. Scott, 394 F.3d at 119. Although the "future" event at issue in Scott was a post-deportation criminal conviction (an "adverse" factor), the decision's rationale does not distinguish between "adverse" and "favorable" post-deportation developments. Id. at 118-119

At the hearing, however, the Court allowed the testimony, and does not now read the temporal limit announced in Scott as a categorical bar to considering it. The impact of deportation on family, a required 212(c) factor, is necessarily forward-looking to the consequences reasonably foreseeable at the time of the 212(c) application. See United States v. Etienne, 2005 WL 165384, *7 (D. Conn.) (Although IJ could not have known actual effect of deportation on family, hardship was foreseeable) United States v. Castro, 472 F. Supp. 2d 321, 334 n. 11 (E.D.N.Y. 2007) (same). In any event, based on the picture of defendant's family that emerged at the hearing, the Court has little doubt that what has turned out, in fact, to be the impact of defendant's deportation does not differ materially from what would have been reasonably foreseeable to an IJ hearing testimony from these same individuals over a decade ago.

[4] Even if the Court were to find that a reasonable probability than an IJ would have exercised discretion in favor of waiving deportation, that finding would result only in the dismissal of the indictment for illegal reentry but would not secure defendant's return to this country.

importance of family ties in the 212(c) calculus and the magnitude of family presence in this case, it bears underscoring, as the authorities discussed throughout this decision make clear, that "family ties" are not a magic charm for 212(c) purposes. It is defendant's criminal conduct that triggered deportation in the first instance, and family considerations are before the Court as potential *offset* of that conduct. The relevant inquiry here is not on the mere fact of family existence but whether the nature of defendant's relationship to his family ("*ties*," in the language of 212(c)) would have warranted a discretionary waiver of deportation. This Court answers that question in the negative.

Defendant's large, law-abiding, gainfully employed family has not deterred defendant, either by example or intercession—even by the brother who is a corrections officer—from the unfortunate criminal choices that he made for the better part of his time in this country. Conversely, concern that his incarceration might set a poor example for his children or cause his mother or brothers heartache has not kept defendant from committing crimes, repeatedly. And sandwiched between the testimonial assertions of love and closeness were admissions by much of his family that they had limited if any knowledge of defendant's crimes.[5]

It is a non-blood relation, in fact, who perhaps understood defendant best. Sophia Malcolm (sister of Gloria Tomlinson, the mother of three of defendant's children), who described herself as

---

[5] For example, defendant's mother testified that she did not know what crimes her son has been arrested for, although she did admit to knowing in a general way about her son's drug use. Tr. 51, 53. Defendant's brother Ken Roy Moe, who testified that defendant was "always a great brother," did not know what defendant was arrested for. Tr. 59. He admitted that he "never really got into the details of it, asking that question, why he was arrested. Tr. 59. Likewise, defendant's brother Michael Moe (a corrections officer), who testified that defendant and he have "a solid relationship" and are "very close," also admitted that he did not know the crimes for which defendant was arrested and convicted. Tr. 69.

"real good friends" with defendant, testified that she "wasn't aware of what he was selling," but she knew "he was in the streets." Tr. 117. Pressed to explain what she meant, Malcolm reiterated that defendant "was in the streets like all the guys . . . just in the street," and she knew that most of the people defendant was in the street with were selling drugs. Id. Defendant's mother, likewise, suspected defendant was using drugs because he was "always in [with] the wrong type of people in the streets . . . most of the time." Tr. 54.

No witness, however, testified about success in keeping defendant off the streets, or about a personal or family plan for doing so in the future.

Defendant's own testimony hardly served to complement the family testaments on his behalf.[6] The Court did not hear him profess any concern for their well-being in his absence or exhibit gratitude for their present efforts on his behalf, but did hear him use them as an excuse for some of his own criminal conduct. For example, defendant avoided reporting for sentencing on his 1988 firearms charge because he knew he would be incarcerated and "was scared of losing [his] family," and blamed his family both for his drug use[7] and drug sales. Tr. 14, 27. The Court also listened again to disturbing admissions of defendant's physical abuse of his wife, who testified that the mistreatment occurred for between six months and a year, Tr. 81-2, while defendant's mother believed the abuse occurred for a much longer period of time. Tr. 55.

---

[6] Defendant remains in Guyana but testified and was present for the hearing through the use of Skype, an internet-based video telephone system. The hearing was held in the library of the United States Attorney's office, which was better able than the court to accommodate the technology that made this live interaction with defendant possible.

[7] Defendant offered the following account of how he first came to develop a drug problem: "[w]hen I come out of prison, me and my wife start having problems, and I turn to crack cocaine, that my friend and I started to sell crack cocaine." Tr. 16.

9

Returning to defendant's children, the Court notes that despite Erica's understandable struggle at the hearing, she was between three and four years of age when defendant began a one-year prison term and seven when he entered on the crack cocaine charges in 1994, directly after which he was deported. She herself stated that she has no memory of seeing him in this country when he was not in jail, Tr. 44, a view confirmed by her own mother, who stated that Erica did not really know defendant "at all." Tr. 106. Since defendant's deportation, Erica speaks to him on the telephone almost weekly. Tr. 106. The other teenage children of Georgia Tomlinson and defendant, Akeem and Raven, likewise do not know defendant "at all." Tr. 106.

As for Latoya, the change in behavior blamed in part on defendant's deportation had begun when Latoya was "much younger" and defendant was incarcerated. Tr. 76. In fact, her mother admitted that defendant's time in jail "really took a big toll" on Latoya and "mess[ed] her up a lot, too, because she would be visiting him, thinking he would be coming home, and then no father to come home to." Tr. 76. The contention that Latoya's experience since her father was deported might warrant 212(c) relief for him is further undercut by the fact that: (i) it was Latoya's mother (defendant's wife) whom defendant physically abused; (ii) for a significant period of the marriage, defendant lived not with Latoya and her mother but with the other mothers of his other children;[8] and (iii) defendant was almost always on the street rather than home tending to his daughter, according to Latoya's aunt and grandmother and defendant himself. Tr. 30, 116, 117,

---

[8] Confidential materials furnished by the New York State Division of Parole for *in camera* inspection indicate that defendant's residence of choice upon release was with his mother, not with any of his children.

54, 30.[9] To the extent any hardship resulting from deportation is "not unlike the hardship . . . endured while defendant was incarcerated," it is not grounds for finding a probable 212(c) waiver. Matter of Coehlo, 20 I. & N. Dec. at 469. This is because "the responsibility for this [impact] rests with [defendant] alone." Id.

On the financial side, there has been no claim of hardship due to defendant's deportation, nor could there be (see discussion below under "gainful employment").

### 2. Hardship to Defendant

Other than expressing a desire to return to his family here, defendant did not testify to financial, familial or work-related hardship in Guyana. Further, Latoya's description of her trip there refers to visits with relatives and shopping. (Exhibit PM-E.)

### 3. Rehabilitation and Moral Character

Although rehabilitation is not an absolute pre-requisite to 212(c) relief, Matter of Edwards, 20 I. & N. Dec. 191, 196 (BIA 1990), the Court is not barred from considering the lack of it as an adverse factor, Matter of Roberts, 20 I. & N. Dec. 294, 302 (BIA 1991), particularly where, as here, defendant affirmatively argues that he has established rehabilitation, and where the record as

---

[9] Other than the observations of her mother, which the Court does not discredit, there was no evidence, clinical or otherwise, fleshing out the claimed causal link between Latoya's difficulties as a teen and defendant's deportation  In any event, Latoya has been able to make one trip to Guyana to see her deported father; and while there, according to her mother, she "had a great time. She had fun. And she was always with her father. He did a lot of things together with her. They went shopping, took her around the place, met families, friend, you know?" Tr. 78. Further, although Latoya did not testify, her letter reflects that she may not be doing as poorly as others believe, for she acknowledges, among other things, that she went about most of her life without defendant, that her uncles do try to fill his place, that she knows what she is doing is wrong when she acts out toward her teachers and others, that her mother takes her to weekly counseling to get the help she needs, and that she occasionally performs in dance shows or as a cheerleader at school. See Exhibit PM-E (letter of Latoya Moe).

a whole points more toward recidivism. To be sure, defendant did not receive any serious violations or commit any serious infractions while in prison, and participated there in a number of educational programs where his evaluations describe him as hard-working and courteous and score him as excellent or satisfactory in most categories, Exhibits PM I, J and K, but there is no evidence that defendant made strides once outside of prison, when it is undisputed that his drug use resumed. Given the central, causal role that defendant himself assigns to drug use in his overall criminality, inferences of rehabilitation seem quite foreclosed.

More critical to this Court's view on the claim of rehabilitation is the evasiveness defendant displayed at the hearing when purporting to accept responsibility (for his past crimes, drug use and abuse of his wife). Defendant testified both that he "turn[ed] to crack cocaine" because he and his wife "ha[d] problems," Tr. 16, and also testified that it was a gunshot wound "[t]hat caused [him] to smoke crack cocaine, because it damaged [his] left arm." Tr. 34. He alternately offered quick profit and support of family as motives for his drug sales, Tr. 27-8, both of which contradict what he told state probation officials, which is that he needed to support his own drug habit. On his weapons possession, in lieu of remorse, defendant tendered excuses that cast him as a passive participant whose mistake lay in getting caught, not in having the gun: he testified that he "was coming from work" and "was pulled over" and "was picked up for possession of a gun" and that the gun "was for his protection." Tr. 13-14. Although these assertions establish that defendant knew he had a gun (because it "was for his protection"), defendant consistently led his family to believe otherwise, claiming (through them) that he

12

borrowed the car of a friend who had left the gun there. See, e.g., Tr. 51-54.[10]

On the disturbing subject of spousal abuse, defendant again accepted responsibility only grudgingly:

> Q. The problems with your wife was the fact that you were beating her, isn't that correct, Mr. Moe?
>
> A. No, sir. Sir, me used to have a lot of family problem, a lot of problem. I used to be out on the streets a lot, and my wife and me used to argue. We used to argue, and we used to have our ups and downs, little fight.
>
> Q. And during those fights, you had hit her, correct?
>
> A. Yes, sir. Sir, I would hit her, but not no — yes, sir, I would hit her. Tr. 30.

Particularly for someone with defendant's history of crime and subterfuge, unqualified acceptance of responsibility and genuine remorse are the indispensable platform on which any claim of rehabilitation must rest, and there can have been no more prudent time for defendant to have displayed these traits than at his post-remand Copeland hearing.[11] In his demeanor and

---

[10] For section 212(c) purposes, while an IJ or the BIA cannot go behind a record of conviction to reassess an alien's ultimate guilt or innocence, inquiry may be had into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. Matter of Edwards, 20 I. & N. Dec. at 194, 197 (internal citation omitted). But see Matter of Roberts, 20 I. & N. Dec. 294, 302 (BIA 1991) (although alien claims "he did not engage in drug trafficking for financial gain, his participation in such a transaction clearly demonstrates a serious disregard for the welfare of society"). With nothing more than the testimony of defendant's family that defendant later told them the gun was not his, there was no reason for the Court to explore this subject further.

[11] Defendant's post-hearing brief asserts that defendant "clearly expressed remorse for his conduct through his testimony at the Copeland hearing." Deft. Br. at 12. But the brief's only record citation is to the following:

> Q. And at the time of your deportation, what did you learn as a result of the penalty you

testimony, however, defendant displayed quite the opposite—and what in the view of this Court (which has had a lengthy exposure to defendant, having taken his plea on the illegal reentry charge and pronounced sentence)—are in fact his true colors.

4. Gainful Employment

Defendant testified that he was gainfully employed for approximately the first six years in this country (1982-88) at a gas station, supermarket warehouse, and auto shop. Tr. 12-13. He did not produce corroborative records, or the tax returns he claims he filed, Tr. 32, and state probation records confirm 1988 as defendant's last lawful job. The Court finds, therefore, that defendant's gainful employment would not have weighed heavily as a favorable factor in a 212(c) proceeding because to the extent it occurred, it was abandoned almost a decade before defendant's deportation, having been fully supplanted by drug sales that began at least as early as 1985 (the year of his first drug conviction).[12]

Defendant's bootstrapped assertion that he provided financial support for *all* his children, Tr. 32, also collapses, because (i) certainly no IJ would waive deportation to allow a family to be supported with drug money; (ii) defendant eventually admitted that his gainfully employed mother and brothers would help support his out-of-wedlock children, and did so "because they kn[e]w [defendant] had a drug problem," Tr. 32; (iii) the mother of these children (Erica, Raven and

---

paid for those crime?
  A. Sir, I learn a lot from it, sir, because I lost my whole family, the only thing that I have.
Tr. 22.

There was also testimony from two of his brothers that, during prison visits, defendant expressed remorse to them and a belief that he had learned his lesson. Tr. 60, 96.

[12] No evidence was offered with respect to what defendant has done with himself in Guyana.

Akeem) testified unequivocally that defendant never provided any financial support, Tr. 106; and (iv) the only colorable claim of support from lawful income relates to the household of defendant's wife (mother of Latoya), but that support ended "years ago," even before defendant's incarceration. Tr. 79, 80.

### 5. Community Service

The Court heard briefly from a Michael Fitzpatrick, who comes from the same village in Guyana as defendant and superintends a family shelter here in New York where, in 2003, defendant volunteered some of his time. Tr. 118. Defendant concedes that volunteer work he performed in 2003 would not have been before an IJ in 1995, but the Court allowed the testimony, which revealed only that for a period of no longer than two months defendant showed up at the shelter, was "a good worker" and "quiet." Tr. 121-2.

### 6. Additional Mitigating Factors

The testimony established that the entire Moe family experienced some degree of difficulty back in Guyana, where they had all lived together before emigrating here in shifts, Tr. 23, and where their father was abusive and parental relations were strained. Tr. 9, 11, 47, 48. But the extent to which these past difficulties mitigate defendant's criminality is limited because everyone else in defendant's family managed to overcome them. As to why defendant's adult choices contrast so sharply with those made by the rest of his family, the Court heard the heartfelt theories of his mother and brother that defendant, as the eldest, perhaps bore the brunt of the early family difficulties, having occasionally been the one to fight back with their father, and having been called upon by his mother while still a teenager to help raise the other children. Tr. 51, 94. Defendant's mother also admitted that perhaps she had asked too much of defendant in this

respect. Tr. 52. In this Court's view, these historical explanations for defendant's eventual turn to criminality may have marginally mitigating value but do not excuse his conduct or materially lessen the gap between his and his family's choices as adult residents of this country.

7. Balancing of the Factors

On the adverse side, adding to defendant's substantial criminal history is the "presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident," Copeland, 376 F.3d at 74 (citing Marin, 16 I. & N. Dec. at 584), namely, the rehabilitative deficiencies just discussed (grudging acceptance of responsibility, evasive excuse-making, questionable remorse) as well as the disturbing revelations of spousal abuse and, indeed, the generally suspect level of candor displayed by defendant on important matters such as support of his children.

On the favorable side, therefore, the Court does not find adequate offset establishing that waiver of defendant's deportation would have been found to be "'in the best interests of this country.'" Copeland, 376 F.3d at 74 (quoting, Marin, 16 I. & N. Dec. at 584). Adding the family considerations to (i) those the Court already recognized in Moe I (defendant's arrival as a teenager and fifteen years as a lawful permanent resident), and (ii) those fleshed out or foreclosed at the hearing (token community service, aborted gainful employment, lack of hardship to defendant in Guyana, and minimal historical mitigators), the Court does not find a reasonable probability that the scale would have tipped toward discretionary waiver of deportation. See, e.g., Matter of Roberts, 20 I.& N. Dec. 294, 303 (BIA 1991) (212(c) relief denied because at his hearing, alien, though a father of four, "appeared to be more intent in showing that he was 'set up' for the crime of which he was convicted than in expressing remorse for his acts;" also showed only "irregular"

16

employment and "occasional" child support; single narcotics conviction "clearly demonstrates a serious disregard for the welfare of society"); Buscemi, 19 I. & N. Dec. at 631 (212(c) relief denied because alien, though 18-year resident who supported mother and was father figure to siblings, returned to drug use after prison treatment program and failed to demonstrate "the genuine rehabilitation necessary" in face of serious criminal record); Coehlo,, 20 I. & N. Dec. at 470 (212(c) relief denied in part because, despite 23 year residence, large family, sustained intermittent work since age 16, and partial financial support of two young children and elderly mother, drug offense was serious and testimony regarding his own culpability was "evasive");[13] Edwards, 20 I. & N. Dec. at 195 (212(c) relief denied because of BIA's "lack of confidence as to [alien's] rehabilitation" and narcotics conviction itself outweighed alien's good employment history, earnest promise to change his ways, and fact that deportation would put wife and children on welfare).

The Court need not decide whether defendant failed to establish "unusual or outstanding equities" per se because even if he did, discretion in his favor would be neither mandated nor probable. Buscemi, 19 I. & N. Dec. at 631-34; Coehlo, 20 I. & N. Dec. at 464-70; Edwards, 20 I. & N. Dec. at 191-95.

The decisions on which defendant relies, which rule in favor of aliens for 212(c) or 1326(d) purposes, either involve far more compelling equities than defendant presents, or are distinguishable on other grounds. See, e.g., Matter of Arreguin, 21 I.&N. Dec. 38 (BIA 1995) (212(c) relief granted; alien's conviction for importing marijuana was only crime in 23 years here;

---

[13] Defendant's brief mistakenly reads Coehlo as having *granted* a 212(c) waiver. Deft. Br. at 14. This may be because the result of Coehlo has also been misunderstood in several federal 1326(d) decisions on which defendant relies. See, e.g., United States v. Etienne, 2005 WL 165384, *9 (D. Conn.); United States v. Castro, 472 F. Supp. 2d at 333.

her role in offense was minor; she was steadily employed, submitted tax returns, and was the mother and five, including two minors who in her absence became welfare recipients; she pursued GED while in prison, had been involved in church ministry and expressed clear remorse); United States v. Castro, 472 F. Supp. 2d 321 (E.D.N.Y. 2007) (Vitaliano, J.) (1326(d) prejudice established; although convicted of selling cocaine, alien financially supported three young daughters, became their primary caretaker when their mother's drug problem worsened, and had a "steady work history;" court was concerned that absent relief, daughters would become wards of the state); United States v. Etienne, 2005 WL 165384, *8-9 (D. Conn.) (1326(d) prejudice found; despite conviction for possession with intent to sell cocaine, court found "most significant" the fact that defendant had lived with and financially supported fiancee and two children, so deportation would create "significant hardship"to family; also, attempts at rehabilitation were "significant" and "successful"); United States v. Calderon, 2003 WL 1338943 (E.D.N.Y.), aff'd, 391 F.3d 370 (2d Cir. 2004) (alien had full custody of his son and held to only a "plausible showing" standard rather than "reasonable probability").

CONCLUSION

For the reasons stated, defendant's motion to dismiss his indictment for illegal re-entry is denied.

SO ORDERED.

Dated: Brooklyn, New York
April 23 , 2008

RAYMOND J. DEARIE
Chief United States District Judge

18